UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Navitas LLC,

                                    Plaintiff,

            v.

Health Matters America, Inc. et al.,

                                    Defendants.

**Report and Recommendation**

16-CV-699V

## I.      INTRODUCTION

In the late spring and summer of 2014, "[t]he FDA [Food and Drug Administration],

Canadian health officials, the CDC [Centers for Disease Control], and state and local officials

investigated an outbreak of *Salmonella* Newport, *Salmonella* Hartford and *Salmonella* Oranienburg

illnesses linked to products containing organic sprouted chia seed powder."  (Dkt. No. 50-4 at 2

(hereafter [50-4 at 2]).)  The investigation led to product recalls by plaintiff Navitas LLC

("Navitas"); Health Matters America, Inc. and Advantage Health Matters, Inc. (collectively,

"Health Matters"); and Bio Essential Botanicals ("Bio Essential"), among other companies.

Navitas subsequently sued Health Matters and Bio Essential, its chia seed suppliers, for breach of

contract and other theories of liability pertaining to the outbreak.  Health Matters, in turn, filed a

third-party complaint to implead other companies that allegedly were part of the chia seed supply

chain that ended with Navitas: EVI Inc. and EVI International Group (collectively, "EVI"); Tradin

Organics USA LLC;[1] Rowland Seeds Inc.; and Avafina Commodities Inc.  The latter two third-

---

[1] As of this writing, this defendant has not answered or otherwise appeared.

party defendants have since been stipulated out of the case. [82, 83.] Bio Essential filed cross-claims against Health Matters. There are many more details to the parties' allegations, but this summary is a good start.

This case now comes before the Court primarily on two dispositive motions. Health Matters has filed a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure [42] to dismiss most of Bio Essential's cross-claims, for various reasons including failure to plead a contractual relationship and failure to plead elements of a products liability claim. EVI has filed its own motion to dismiss or to stay the case, based mostly on the abstention doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). Health Matters and Bio Essential also have filed motions to amend as an alternative remedy should some or all of their respective pleadings be dismissed. [68, 71.] Additionally, Rowland Seeds Inc. and Avafina Commodities Inc. had filed their own motions to dismiss [49, 56] before they were stipulated out of the case; those motions technically remain pending.

District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b). [25.] The Court held oral argument on February 20, 2018. [92.] For the reasons below, the Court respectfully recommends granting Health Matters's motion to dismiss, but without prejudice to amend; denying EVI's motion to dismiss; granting Bio Essential's motion to amend; and denying the remaining motions as moot.

## II.   BACKGROUND

### A.  *Basic Facts Generally*

This case concerns the fallout from contamination of chia seed products with salmonella bacteria.  For basic background purposes only, the Court takes judicial notice that one example of a chia seed product is organic sprouted chia powder, a nutritional supplement made by sprouting chia seeds and milling them to the consistency of flour.  Navitas is a retail seller of chia seed products.  According to the complaint, around 2011 Navitas entered into agreements with Bio Essential and Health Matters to obtain a supply of chia seed products that would be sold under the Navitas brand name.

The first couple of years between the companies seem to have proceeded uneventfully, but then the salmonella outbreak struck.  The outbreak occurred in 2014 and affected at least 31 customers in the United States and Canada.  Navitas has summarized the outbreak as follows:

> On or about May 28, 2014, Plaintiff Navitas recalled certain products containing chia seed that were supplied to it by Defendants because they were contaminated with Salmonella.  Specifically, Plaintiff recalled specific lots of Navitas Naturals Organic Sprouted Chia Powder, Navitas Naturals Omega Blend Sprouted Smoothie Mix, and Williams-Sonoma Omega 3 Smoothie Mixer, and expanded that recall on June 6, 2014.

> On or about May 28, 2014, the FDA, the CDC, and the California Department of Public Health warned people not to eat products that contained Organic Sprouted Chia Seed Powder subject to the voluntary recall by Navitas.

> On or about June 4, 2014, Defendant Health Matters America conducted a recall of chia seed products because they were contaminated with Salmonella, recalling specific lots of Organic Traditions Sprouted Chia Seed Powder and Sprouted Chia/Flax Seed Powder, and expanded that recall on June 26, 2014.

> The Canadian Food Inspection Agency (CFIA) announced on or about, May 30, 2014, that Defendant Advantage Health Matters was recalling products containing sprouted chia seed powder marketed under the brands Organic

Traditions and Back 2 the Garden.  Subsequently, on June 3, 4, 6, 7, 11, 12, 13, and 25, the CFIA announced an expansion of the recalls.

A trace back of the products reported by ill persons identified Defendant Bio Essential Botanicals as a common supplier of organic sprouted chia powder used in the affected products.

[1 at 3-4.]

### B.  This Litigation Begins

Navitas began this case by filing its complaint on August 29, 2016.  The complaint

contains five claims and names Bio Essential and Health Matters as adverse parties.  In the first

claim, Navitas accuses all defendants of breach of contract.  "There is no federal tolerance for

Salmonella, a potentially deadly pathogen.  Thus, the presence of Salmonella in the contracted for

chia seed products is a breach of the sales contract."  [1 at 4.]  In the second claim, Navitas accuses

all defendants of a breach of the implied warranty of merchantability.  "Because the subject chia

seed products introduced, supplied, sold and/or distributed by Defendants to Plaintiff Navitas []

were contaminated with Salmonella, the chia seed products were not reasonably fit for their

ordinary purposes."  [*Id.* at 5.]  In the third claim, Navitas accuses all defendants of a breach of the

implied warranty of fitness for a particular purpose.  "Plaintiff Navitas relied on each Defendant's

skill and judgment in selecting or furnishing suitable chia seed products for the particular purpose

for which the products were to be used by Plaintiff Navitas, i.e., re-packaging and sale for human

consumption."  [*Id.* at 6.]  In the fourth claim, Navitas accuses all defendants of a breach of the

implied warranty for the sale of food.  "Defendants materially breached the implied warranty for

the sale of food by providing Plaintiff Navitas with chia seed products contaminated with

Salmonella, for which there are no federal tolerances, and thus, necessitating the recall of the

subject chia seed products by Plaintiff Navitas." [*Id.* at 7.] In the fifth claim, Navitas accuses all defendants of negligence.

## C. Third-Party Complaint and Cross-Claims

Within a few months, this case acquired another layer of pleadings that reflected the layers of suppliers, processors, and retailers in the chia products market. On April 19, 2017, Health Matters filed a third-party complaint under Rule 14,[2] naming EVI Inc., EVI International Group, Tradin Organics USA LLC, Rowland Seeds Inc., and Avafina Commodities Inc. as third-party defendants. [35.] According to the third-party complaint, Health Matters "purchased raw chia and flax seeds (the 'Seeds') from Third-Party Defendants EVI, Tradin, Rowland, and Avafina." [35 at 3.] Health Matters then sent the Seeds to Bio Essential to be germinated and milled. Once it received the milled seed products, Health Matters package the products under various labels and sold or resold them to various wholesale and retail customers. [35 at 3–4.] When discussing the salmonella outbreak and the resulting product recalls, Health Matters's key contention is that "[u]pon information and belief, the products recalled contained Seeds, or byproducts therefrom, which came from the Third-Party Defendant Seed Vendors." [35 at 5.]

The third-party complaint contains four claims. In the first claim, Health Matters accuses all third-party defendants of a breach of the implied warranty of merchantability. According to Health Matters, "Each of the Seed Vendors breached its implied warranty of merchantability because the Seeds would not pass without objection in the trade under the contract description, due to the Salmonella Contamination. Each of the Seed Vendors breached its implied warranty of

---

[2] Health Matters properly obtained leave from the Court for a delayed filing, under Rule 14(a)(1). [34.]

merchantability because the Seeds were not of fair average quality within the description, due to the Salmonella Contamination. Each of the Seed Vendors breached its implied warranty of merchantability because the Seeds were not fit for the ordinary purposes for which they are used, due to the Salmonella Contamination." [35 at 6.] In the second claim, Health Matters accuses all third-party defendants of breach of the implied warranty of fitness for a particular purpose. "Each of the Seed Vendors breached the implied warranty of fitness for a particular purpose because the Seeds were not fit for human consumption due to Salmonella Contamination." [35 at 8.] In the third claim, Health Matters accuses all third-party defendants of negligence. In the fourth claim, Health Matters accuses all third-party defendants of strict products liability.

This case also includes cross-claims. On May 25, 2017, Bio Essential filed an answer to Navitas's complaint that included affirmative defenses along with 11 cross-claims against Health Matters. The cross-claims cover contribution; indemnity; negligence; breach of oral contract; breach of written contract; breach of warranty; product liability; strict products liability; negligence and negligence per se; unfair trade practices; and fraud. [39 at 12–22.]

In the motions that are pending, the parties have made requests for a variety of dispositive relief against each other's claims or cross-claims. Rather than attempt to summarize them here, the Court will address each request individually below.

## III.    DISCUSSION

### A.  Motions to Dismiss Generally

Most of the relief sought in the pending motions would consist of dismissals under Rule 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). Courts assess Rule 12(b)(6) motions "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted). "On a motion to dismiss, the court may consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (editorial and internal quotation marks and citation omitted). "Simply stated, the question under Rule 12(b)(6) is whether the facts supporting the claims, if established, create legally cognizable theories of recovery." *Cole-Hoover v. Shinseki*, No. 10-CV-669, 2011 WL 1793256, at *3 (W.D.N.Y. May 9, 2011) (internal quotation marks and citation omitted).

As a preliminary matter, the Court must decide whether to consider a number of documents that have become part of the record but lie outside of the original and third-party complaints. "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review

only a narrow universe of materials.  Generally, we do not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation and editorial marks and citation omitted).  "Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.  However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citations omitted).  "A document is integral to the complaint where the complaint relies heavily upon its terms and effect.  Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough.  In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Goel*, 820 F.3d at 559 (internal quotation and editorial marks and citations omitted).

Applying this standard, the Court can consider a few of the documents in the record.  The record contains a copy of a complaint that Health Matters filed in the Ontario Superior Court of Justice on May 24, 2016.  [50-3.]  No one has disputed the accuracy or authenticity of this

document. Any litigation that might be occurring in Canada is not referenced in either the original or the third-party complaint but directly affects the Court's subject-matter jurisdiction— specifically, whether the Court should abstain from hearing this case. The Court has more to say about the Canadian litigation below; for now, the Court acknowledges that it has considered the copy of the Ontario complaint for the limited purpose of comparing allegations in that case to allegations in this case. The record also contains copies of various press releases that provide some details about the salmonella outbreak and the ensuing product recalls. [50-4 to 50-12.] The Court has not relied on these press releases for any legal analysis, but since the parties have not disputed any of the details in them, the Court has considered them briefly for background purposes only. Finally, the record contains copies of what appear to be purchase orders between Health Matters and Bio Essential. [70-1.] The parties do not dispute the authenticity or accuracy of these copies; in fact, Health Matters believes [81 at 3] that the purchase orders support its arguments even though Bio Essential submitted them. In the absence of any dispute about authenticity or accuracy, the Court has considered the purchase orders as central to understanding various arguments from the parties about the existence or absence of contractual obligations.

The Court has not considered any other documentary evidence in the record. For example, Bio Essential included in its papers copies of what appear to be various email messages along with photographs of product samples. [70-2 at 70-8.] At most, these documents are evidence, and "[t]he court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (citation omitted).

9

**B. Health Matters Motion (Dkt. No. 42)**

Through its motion, Health Matters seeks dismissal of the fourth through eleventh cross-claims that Bio Essential has asserted against it.

### i. Fourth and Fifth Cross-Claims

Health Matters seeks dismissal of Bio Essential's fourth and fifth cross-claims, for breach of oral contract and breach of written contract, respectively. The fourth cross-claim reads in its entirety as follows:

> Defendant BEB [Bio Essential] and defendants, HMA and/or AHM [Health Matters], had orally agreed to contract as follows, defendants, HMA and/or AHM would deliver certain seeds it purchased from a farm or distributor to be toll processed by BEB and then picked up by HMA, and/or AHM, or delivered directly to their customers when completed.

> That defendant BEB did toll process the seeds delivered by HMA and/or AHM and otherwise fully performed in accordance with the oral contract and also in full compliance with the Canadian Food Inspection Agency guidelines/standards, and at the specific instance and request of defendants HMA and/or AHM.

> That prior to May 28, 2014 defendants, HMA and/or AHM, breached the oral contract by delivering seeds of inferior quality, or which had been improperly handled, stored or shipped or were otherwise contaminated by salmonella and other contaminants and debris.

> That due to HMA and/or AHM's breach of the oral agreement, BEB had to participate in a recall, on or about May 28, 2014 or June 4, 2014, of products that it had toll processed, and as a result, defendant, BEB has sustained injuries and damages in an amount to be determined at trial.

[39 at 13–14.] The fifth cross-claim reads in its entirety as follows:

> Defendant BEB and defendants, HMA and/or AHM, through their course of conduct, contracted in such a manner that HMA and/or AHM would issue purchase orders for the delivery of chia seeds to be toll processed by BEB at agreed upon rates.

That for each purchase order received, from HMA and/or AHM, defendant BEB would arrange for the toll processing of the chia seeds delivered and sourced by HMA and/or AHM and would toll process the same for pickup by HMA, and/or AHM, or delivered directly to their customers when completed.

That defendant BEB did timely toll process the chia seeds delivered by HMA and/or AHM and otherwise fully performed in accordance with the oral contract and also in full compliance with the Canadian Food Inspection Agency guidelines/standards, and at the specific instance and request of defendants HMA and/or AHM.

That defendants, HMA and/or AHM, breached the terms of the purchase order by delivering chia seeds of inferior quality, or which had been improperly handled, stored or shipped or were otherwise contaminated by salmonella and other contaminants and debris.

That due to HMA and/or AHM's breach of the purchase order, BEB had to participate in a recall, on or about May 28, 2014 or June 4, 2014, of products that it had toll processed, and as a result, defendant, BEB has sustained injuries and damages in an amount to be determined at trial.

[39 at 14–15.]

According to Health Matters, Bio Essential has not pled the terms of any oral or written contract that existed. With respect to any purported oral contract,

Here, BEB alleges that Health Matters "breached the oral contract by delivering seeds of inferior quality, or which had been improperly handled, stored or shipped or were otherwise contaminated by salmonella and other contaminants and debris." Cross-Claims ¶ 98. The only contract terms alleged are that "[Health Matters] would deliver certain seeds it purchased from a farm or distributor to be toll processed by BEB and then picked up by [Health Matters], or delivered directly to their customers when completed. Cross-Claims ¶ 96. Nowhere does BEB allege that seed quality, handling, storage, shipment, or absence of contaminants or debris were terms set forth in the contract, much less what those terms called for.

[42-1 at 3–4.] Health Matters makes a similar argument against any allegations about a written contract:

11

BEB alleges that it contracted with Health Matters such that: (1) "[Health Matters] would issue purchase orders for the delivery of chia seeds to be toll processed by BEB at agreed upon rates;" (2) for each purchase order, BEB "would arrange for the toll processing of the chia seeds delivered and sourced by [Health Matters] and would toll process the same for pickup by [Health Matters], or delivered directly to their customers when completed;" and that (3) [Health Matters] "breached the terms of the purchase order by delivering chia seeds of inferior quality, or which had been improperly handled, stored or shipped or were otherwise contaminated by salmonella and other contaminants and debris." Cross-Claims ¶¶ 100–01, 103. BEB does not specify which precise terms of the purchase orders were allegedly breached by Health Matters; thus BEB's Fifth cross-claim fails to assert facts sufficient to state a legally sufficient claim for recovery.

[42-1 at 4.] Bio Essential defends its pleading of a breach of oral contract as follows:

In paragraph 96 of the Answer (Doc # 39 at page 13) Bio Essential alleges it and Health Matters contracted orally for Health Matters to deliver to Bio Essential seeds to be toll processed and then returned to Health Matters or forwarded on to Health Matters' customers when completed. These are the primary terms of the oral contract between the parties which was fluid, as the type of seeds, volume of seeds and milling rates varied from order to order. For the Court's edification, toll processing seeds, includes the sprouting or germinating of seeds (whether grains, nuts, or beans) and then kiln drying the seeds and finally, depending on the specifications of the purchase order from Health Matters, either re-packing or milling and re-packing to be picked up by Health Matters or in some cases shipped direct to Health Matters' customers like Plaintiff, Navitas, LLC. Much of the process and specifics as to how long seeds are soaked, allowed to germinate, testing, and dry time and temperature are all proprietary to Bio Essential's processes and the contract between the parties does not govern those specifics, only the input and desired output are detailed in the contract. Bio Essential at times had to reject seeds delivered by Health Matters because it was dirty, contaminated, or of a quality such that it could not be germinated. Clearly the essential terms of the contract were laid bare before the court in Bio Essential's Answer. *See Sirohi v. Trustees of Columbia Univ.*, 1998 U.S. App. LEXIS 22519, 5 (2d Cir. 1998) (citing *Chrysler Capital Corp. v. Hilltop Egg Farms*, 514 N.Y.S.2d 1002, 1003 (3d Dep't 1987) (complaint must, *inter alia*, set forth the terms of the agreement upon which liability is predicated)). Paragraph 97 in the Answer (Doc # 39 at page 14) alleges that Bio Essential performed in accordance with the oral contract. Paragraph 98 of the Answer (Doc # 39 at page 14) alleges the breach of the contract by Health Matters by, "delivering seeds of inferior quality, or which had been improperly handled, stored or shipped or were otherwise contaminated by salmonella and other contaminants and debris." In particular, there is evidence that Health

12

Matters had sent poor or low-quality seeds to Bio Essential for testing, which when tested produced a very low yield of sprouted seeds. Of that seed lot most were immature seeds which couldn't be sprouted and therefore couldn't be processed and milled in accordance with the specifications that Health Matters had required for that lot. Upon information and belief, poor-quality seeds were mixed in with the better-quality seeds which may have resulted in the contamination or alternatively, the contamination existed before toll processing and was carried through toll processing as all the equipment utilized was routinely sanitized and therefore would not have contributed to the contamination. The failure to provide food grade quality seeds constituted a breach of the oral contract which lead to the recalls of chia seeds and later flax seeds which were traced back to Health Matters and ultimately to Bio Essential.

[69 at 3–4.] Bio Essential has a similar argument about how it pled the breach of a written

contract:

> Moreover, there are purchase orders issued by Health Matters to Bio Essential for the sale of the toll processed seeds, those purchase orders, copies of which were annexed to the Affirmation of Gail Barker, constitute contracts between the parties. As described above, "In a contract for a sale of goods, the essential terms are quantity, price, and time and manner of delivery." *Dell's Maraschino Cherries Co v. Shoreline Fruit Growers Inc.*, 887 F. Supp. 2d 459, 471 (E.D,N.Y. 2012) (quoting *DiMare Homestead, Inc. v. Alphas Co. of N.Y., Inc.*, 2012 U.S. Dist. LEXIS 48546 at *67–68 (S.D.N.Y. 2012) (citation and internal quotation marks omitted)). As a result, there clearly were contracts between the parties and as alleged in the Fourth and Fifth Cross-Claims, those contracts were breached by Health Matters when they failed to provide seeds of sufficient quality to allow Bio Essential to deliver the product specified which was adequately processed and free from contaminants.

[69 at 4–5.]

"Under New York law, an action for breach of contract requires proof of (1) a contract; (2)

performance of the contract by one party; (3) breach by the other party; and (4) damages." *First*

*Inv'rs Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (internal quotation marks and

citation omitted). Contracts can be created orally and can be implied from the conduct of the

parties. *See, e.g., Baltimore & O.R. Co. v. United States*, 261 U.S. 592, 598 (1923) ("Such an

agreement will not be implied unless the meeting of minds was indicated by some intelligible conduct, act or sign.") (citation omitted); *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984) ("The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain 'complete immunity from all obligation' until a written agreement is executed. What matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances.") (citations omitted); *see also Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 575–76 (2d Cir. 1993) (citing factors frequently used to determine when parties intend to be bound absent a writing). Depending on the circumstances, written purchase orders can either create contracts on their own or can confirm existing oral or written contracts. *See, e.g., Gambino v. Payne*, No. 12-CV-824-LJV-MJR, 2017 WL 1046733, at *2 (W.D.N.Y. Mar. 20, 2017) (purchase order stated on its face that it was the contract); *Daisey Indus., Inc. v. K-Mart Corp.*, No. 96 CIV. 4211 AGS RLE, 1997 WL 642553, at *3 (S.D.N.Y. Oct. 17, 1997) ("In their telephone agreement, Daisy and Kmart had met the requirements for a contract. Indeed, they had reached a greater level of specificity, agreeing on colors, sizes and desired style. The purchase orders were merely written confirmations of the contract already agreed to by the parties.") (citation omitted).

Here, Health Matters has the better position about the cross-claims in their current form, but the defects are not fatal. The Court agrees with Health Matters that Bio Essential's cross-claims currently do not plead details such as who all the parties to the contracts were; how long the contracts were supposed to last; what the delivery terms were and for what price; and, in the case of the purchase orders, whether each purchase order constituted an independent contract or a

course of conduct under some broader contract. *Cf. Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 104 (2d Cir. 2012) (summary order) ("Without providing additional factual allegations regarding, *inter alia*, the formation of the contract, the date it took place, and the contract's major terms, the proposed amended complaint similarly fails to sufficiently plead the existence of a contract."); *Commercial Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14-CV-7483 (MKB), 2017 WL 3432073, at *16 (E.D.N.Y. Aug. 8, 2017) (failure to plead sufficient contractual details fatal to a tortious-interference claim); *Emerald Town Car of Pearl River, LLC v. Philadelphia Indem. Ins. Co.*, No. 16 CIV. 1099 (NSR), 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017) (same); *see also, e.g.*, *Rochester-Genesee Reg'l Trans. Auth. v. Cummins Inc.*, No. 09-CV-6370-MAT, 2010 WL 2998768, at *4 (W.D.N.Y. July 28, 2010). Nonetheless, the parties agree implicitly that they had some kind of relationship, and that Health Matters delivered some quantity of chia seeds to Bio Essential, at some point in time, under some circumstances. Amending the cross-claims thus would not be futile; this early in the litigation, with no scheduling order in place and no significant amount of discovery having occurred yet, Bio Essential should have a chance to do so. *Cf., e.g.*, *Hillair Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 339 (S.D.N.Y. 2013) ("Here, at this early stage of the case, there is no concern about delay, bad faith, or prejudice. The critical issue is whether the [amendment] would be futile."); *Peters v. City of Buffalo*, 848 F. Supp. 2d 378, 382 (W.D.N.Y. 2012) ("Defendants have provided no grounds on which they would be prejudiced. Further, this Court finds that at this early stage of the litigation there is no undue prejudice to defendants that would preclude amendment of the complaint.").

The Court thus recommends granting Health Matters's motion with respect to the fourth and fifth cross-claims, but without prejudice to amend.

      *ii.*     *Sixth Cross-Claim*

Health Matters seeks dismissal of Bio Essential's sixth cross-claim, for breach of warranty. The sixth cross-claim reads in its entirety as follows:

> Defendants, HMA and/or AHM breached the express and implied warrantees [sic] that it made regarding the adulterated, contaminated, and/or debris laden chia seeds or otherwise not fit for human consumption despite HMA and/or AHM knew [sic] the product was intended for use and/or would be used for human consumption, that it delivered to BEB for toll processing, including but not limited to the implied warrantees of merchantability and/or fitness for a particular use.

> Defendant BEB alleges that the Salmonella-contaminated chia seeds that the defendants, HMA and/or AHM, purchased, sourced or otherwise provided to BEB would not pass without exception in trade and was therefore in breach of the implied warranty of merchantability and was defective.

> In January of 2014, HMA and/or AHM sent chia seed samples to BEB for testing, which BEB advised were poor quality seeds and as a result, should not have been used in food grade products.

> Upon information and belief, HMA and/or AHM blended this low quality seed with higher quality seed in an effort to disguise the low quality seed and sold it as food grade product to its customers like Plaintiff, Navitas.

> Defendant BEB alleges that the salmonella-contaminated food that the defendants, HMA and/or AHM, provided was not fit for the use and purposes intended, including tolling and human consumption and that this product was therefore in breach of the implied warranty of fitness for its intended use.

> As a direct and proximate cause of the defendants, HMA and/or AHM, breach of warranties, as set forth above, the defendant, BEB, sustained injuries and damages in an amount to be determined at trial.

[39 at 15–16.] Health Matters argues simply that Bio Essential has not pled the terms of any express warranty and has not pled the occurrence of any sale that would implicate any warranties:

BEB's Sixth Cross Claim fails as a matter of law; nowhere does BEB allege that Health Matters sold *anything* to BEB. Under New York's Uniform Commercial Code, only "sellers" may be held liable for a breach of warranty, and a plaintiff must therefore—at the very least—allege that it bought something from a defendant in order to be able to recover for breach of warranty. *See Rosen v. Hyundai Grp. (Korea)*, 829 F. Supp. 41, 50 (E.D.N.Y. 1993) (dismissing a wholesale distributor's warranty claim against a manufacturer where the distributor had purchased allegedly defective goods from a middleman); NY UCC § 2-314 (imposing an implied warranty of merchantability in contracts of sale); NY UCC § 2-315 (imposing an implied warranty of fitness for a particular purpose on sellers). The alleged relationship between BEB and Health Matters was as a provider of services to Health Matters, *see* Cross-Claims ¶¶ 105–07, 113, and New York law does not recognize a cause of action for breach of warranty arising out of the performance of services. *Champion Home Builders Co. v. ADT Sec. Servs., Inc.*, 179 F. Supp. 2d 16, 27 (N.D.N.Y. 2001), *as amended* (Jan. 25, 2002) (citing *Verra v. Koluksuz*, 74 A.D.2d 932, 932–33 (3d Dep't 1980)). Further, as alleged, BEB was the party performing services for Health Matters—warranties protect consumers, not upstream contractors that provided services in the manufacture of an allegedly defective product.

As to the allegation that Health Matters breached express warranties, Cross-Claims ¶ 105, BEB's breach of warranty cross-claim fails for the same reason as does its breach of contract claims: nowhere does allege the terms of the express warranty allegedly owed to BEB. *See Intercept Pharm., Inc.*, 615 F. App'x at 43. Thus, BEB's Sixth cross-claim fails as a matter of law and must be dismissed.

[42-1 at 5.] Bio Essential responds that it "relied upon the oral and express representations by Health Matters that they would provide seeds which were capable of being tolled, and leading up to the recall, delivered seeds of inferior quality and which may have been contaminated with salmonella." [69 at 6.] As for the argument about not selling anything or providing only services, Bio Essential notes that

> there is privity of contract between Health Matters and Bio Essential because of the existence of purchase orders issued by Health Matters to Bio Essential for the sprouted and milled seeds. As a result any deficiency as to an allegation of a purchase by Bio Essential in its Sixth Cross-claim is unavailing. In addition, the claim by Health Matters that all that Bio Essential was providing was a service is a red herring. As described hereinabove, the toll processing and milling of the seeds

17

produces a completely different product which is being sold to Health Matters in accordance with the terms of the purchase orders. The processing of the seeds is a kin to Health Matters supplying raw materials and Bio Essential producing a product with those materials and selling it back to Health Matters. That sale is a sale of goods under the UCC and therefore entitles Bio Essential to make a claim for breach of warranty as against Health Matters as they are in fact in privity of contract.

[69 at 6.] Finally, Bio Essential defends its belief that an implied warranty of fitness accompanied every delivery of chia seeds from Health Matters:

Bio Essential believes that documentation and evidence available to it at this time supports a strong claim that the seeds were contaminated upon arrival at Bio Essential facility and by virtue of its sanitary environment and processes, was carried through toll processing, as at the time of the recalls there was no process by which contaminants like salmonella could be eliminated in processing the seeds. As a result the delivery/sale of the raw seeds by Health Matters was with the implied warranty that the seeds delivered were of a food grade quality, were of a sufficient quality to be sprouted, and further were fit for human consumption. As a result, the terms of the warranties alleged to have been breached were clearly stated in the Sixth Cross-Claim.

[69 at 8.]

For the same reasons noted above regarding the fourth and fifth cross-claims, the arguments about express warranties are easy to address. The purchase orders that Bio Essential has included in its motion papers [70-1] say nothing about warranties. Any oral contracts, as Bio Essential has pled them so far, also say nothing. Nonetheless, at this very early stage of the litigation and given that products deliveries did occur, Bio Essential should have one chance to plead what express warranties it believes exist and how they came into existence. The assertion of an implied warranty requires re-pleading for a different reason. "Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C. ("UCC") § 2-314

18

(McKinney 2018). Even if just a technicality based on other facts pled, Bio Essential should plead

that Health Matters qualifies as a merchant under the UCC and should explain why. Once Bio

Essential properly invokes the UCC, its claim about implied warranties will be adequate for Rule

12 purposes. *See Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154 JG RML, 2015 WL 5360022, at

*11 (E.D.N.Y. Sept. 14, 2015) ("Where the sale of a food or beverage is concerned, courts have

ruled that the product need only be fit for human consumption to be of merchantable quality.")

(citations omitted); *Hohn v. S. Shore Serv., Inc.*, 529 N.Y.S.2d 129, 130 (App. Div. 1988) ("A

distributor impliedly warrants that foods sold by description are fit for human consumption and

merchantable.") (citation omitted).

Accordingly, the Court recommends granting Health Matters's motion with respect to the

sixth cross-claim, but without prejudice to amend.

> iii.    *Seventh and Eighth Cross-Claims*

Health Matters seeks dismissal of Bio Essential's seventh and eighth cross-claims, for

product liability and strict products liability, respectively. The seventh cross-claim reads in its

entirety as follows:

> Defendants, HMA and/or AHM breached the express and implied
> warrantees [sic] that it made regarding the adulterated, contaminated, and/or
> debris laden chia seeds or otherwise not fit for human consumption despite HMA
> and/or AHM knew the product [sic] was intended for use and/or would be used
> for human consumption, that it delivered to BEB for toll processing, including but
> not limited to the implied warrantees of merchantability and/or fitness for a
> particular use.

> Defendant BEB alleges that the Salmonella-contaminated chia seeds that
> the defendants, HMA and/or AHM, purchased, sourced or otherwise provided to
> BEB would not pass without exception in trade and was therefore in breach of the
> implied warranty of merchantability and was defective.

19

In January of 2014, HMA and/or AHM sent chia seed samples to BEB for testing, which BEB advised were poor quality seeds and as a result, should not have been used in food grade products.

Upon information and belief, HMA and/or AHM blended this low quality seed with higher quality seed in an effort to disguise the low quality seed and sold it as food grade product to its customers like Plaintiff, Navitas.

Defendant BEB alleges that the salmonella-contaminated food that the defendants, HMA and/or AHM, provided was not fit for the use and purposes intended, including tolling and human consumption and that this product was therefore in breach of the implied warranty of fitness for its intended use.

As a direct and proximate cause of the defendants, HMA and/or AHM, providing a defective and faulty product, as set forth above, the defendant, BEB, sustained injuries and damages in an amount to be determined at trial.

[39 at 16–17.] The eighth cross-claim reads in its entirety as follows:

Defendants, HMA and/or AHM breached the express and implied warrantees [sic] that it made regarding the adulterated, contaminated, and/or debris laden chia seeds or otherwise not fit for human consumption despite HMA and/or AHM knew the product [sic] was intended for use and/or would be used for human consumption, that it delivered to BEB for toll processing, including but not limited to the implied warrantees of merchantability and/or fitness for a particular use.

Defendant BEB alleges that the Salmonella-contaminated chia seeds that the defendants, HMA and/or AHM, purchased, sourced or otherwise provided to BEB would not pass without exception in trade and was therefore in breach of the implied warranty of merchantability and was defective.

In January of 2014, HMA and/or AHM sent chia seed samples to BEB for testing, which BEB advised were poor quality seeds and as a result, should not have been used in food grade products.

Upon information and belief, HMA and/or AHM blended this low quality seed with higher quality seed in an effort to disguise the low quality seed and sold it as food grade product to its customers like Plaintiff, Navitas.

Defendant BEB alleges that the salmonella-contaminated food that the defendants, HMA and/or AHM, provided was not fit for the use and purposes intended, including tolling and human consumption and that this product was

therefore in breach of the implied warranty of fitness for its intended use and defendants, HMA and/or AHM are strictly liable therefore.

As a direct and proximate cause of the defendants, HMA's and/or AHM's, strict liability, as set forth above, the defendant, BEB, sustained injuries and damages in an amount to be determined at trial.

[39 at 17–18.] In seeking dismissal, Health Matters has highlighted how the seventh and eighth cross-claims refer to warranties as other cross-claims did. "BEB's Seventh and Eighth cross-claims, 'products liability' and 'strict liability,' repeat the allegations of the Sixth cross-claim nearly verbatim, creating confusion as to what exact theory of liability BEB intends to assert." [42-1 at 6.] Health Matters then proceeds to argue that "the cross-claims fail as a matter of law because they fail to set out facts necessary to support two essential elements of both theories: damages and causation." [39 at 6.] Health Matters explains the alleged absence of necessary elements as follows:

On their face, the Seventh and Eighth cross-claims offer only conclusory allegations that BEB "sustained injuries and damages," but do not allege any facts indicating actual injury or damage, or connecting the alleged injuries and damages with Health Matters' alleged conduct. The cross-claims do not incorporate preceding allegations, but "perusal" of the entire document reveals that the only injury or damage BEB alleges it suffered, if any, constitutes unrecoverable economic loss. *See Hole v. Gen. Motors Corp.*, 83 A.D.2d 715, 716–17 (3d Dep't 1981). The closest BEB comes to alleging facts that show damages related to the Seventh and Eighth cross-claims is an assertion that BEB had to participate in a recall, asserted as part of BEB's breach of contract cross claims. *See* Cross Claims ¶¶ 99, 104. When a party alleges only economic loss, rather than personal injury or property damage, it has no cause of action in strict products liability or negligence. *See Hole*, 83 A.D.2d at 717. The economic loss doctrine prohibits a negligence or strict products liability recovery here, because commercial parties that fail to preserve their remedies in contract cannot fall back on tort remedies without a personal injury or property damage. *See Bocre Leasing Corp. v. Gen. Motors Corp. (Allison Gas Turbine Div.)*, 84 N.Y.2d 685, 689, 692 (1995). BEB's cross-claims utterly fail to allege any facts showing it has sustained damages that are recoverable in negligence or strict products liability, and the Seventh and Eighth cross-claims must therefore be dismissed for failure to state a legally-cognizable claim.

[39 at 7.] Bio Essential defends its cross-claims with arguments including the argument that "[t]he warranties were relative to the intended use, more specifically, Health Matters was to supply seeds of sufficient quality to be tolled (i.e. sprouted, dried and milled). In particular, the Plaintiff's suit claims that the products delivered by Health Matters contained salmonella contaminated chia seeds. Bio Essential has reason to believe that the contamination occurred either prior to the supply of seeds by Health Matters to Bio Essential or following the return of the tolled seeds to Health Matters." [69 at 10.] Bio Essential argues further that "the strict product liability claim arises for the same reason that the breach of warranty claims arise, namely due to the fact that the bailment arrangement between Health Matters (as bailor) and Bio Essential (as bailee) is akin to a sale and Health Matters knows that it is sourcing the raw materials for Bio Essential to manufacture into the final product which are the sprouted and milled Chia seeds for human consumption which Health Matters sells to other retailers like the Plaintiff, Navitas, LLC." [69 at 12.]

A review of the elements of product and strict product claims is warranted. "To state a cause of action for negligence, [] plaintiffs must show: (1) that [defendants] owed them a duty, or obligation, recognized by law, (2) a breach of the duty, (3) a reasonably close causal connection between [defendant's] conduct and the resulting injury and (4) loss or damage resulting from the breach. In the absence of a duty, as a matter of law, no liability can ensue. Thus it may be said that the defendant was negligent, but is not liable because he was under no duty to the plaintiff not to be." *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) (internal quotation marks and citations omitted). The duty in question has to arise independent of contractual obligations;

among other sources, statutes and regulations can give rise to a duty of care. *Cf., e.g., Great Lakes Cheese of New York, Inc. v. Agri-Mark, Inc.*, No. 714CV0232GTSATB, 2016 WL 5717337, at *12 (N.D.N.Y. Sept. 30, 2016) (handling of raw milk). With respect to strict liability, "[a] manufacturer who places into the stream of commerce a defective product which causes injury may be held strictly liable. In New York, there are three distinct claims for strict products liability: (1) a manufacturing defect, which results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm; (2) a warning defect, which occurs when the inadequacy or failure to warn of a reasonably foreseeable risk accompanying a product causes harm; and (3) a design defect, which results when the product as designed is unreasonably dangerous for its intended use." *McCarthy*, 119 F.3d at 154–55 (citations omitted).

Here, the seventh and eighth cross-claims need clarification that might come in an amended pleading. The seventh cross-claim, in its current form, does not do enough to set forth a duty, and a breach of that duty, apart from contractual obligations covered by other cross-claims. The eighth cross-claim does not make clear which type of strict-liability theory Bio Essential wishes to advance. The references to warranties in both cross-claims repeat theories in other cross-claims and are a needless distraction. Since Bio Essential should have a chance to amend other parts of its pleading, it should have a chance to amend these cross-claims as well. The Court thus recommends granting Health Matters's motion with respect to Bio Essential's seventh and eighth cross-claims, but without prejudice to amend.

*iv.    Ninth Cross-Claim*

Health Matters seeks dismissal of Bio Essential's ninth cross-claims, for negligence and

negligence *per se*.  The ninth cross-claim reads in its entirety as follows:

> Defendants, HMA and/or AHM, owed a duty to defendant, BEB, to use reasonable care in the production, manufacture, and sale of its food products to ensure that the chia seeds delivered to BEB did not become contaminated with Salmonella or any other dangerous pathogen.  Defendants, HMA and/or AHM, breached this duty.

> Defendants, HMA and/or AHM, had a duty to comply with all statutes, laws, regulations or safety codes pe1iaining to the distribution and storage of its food product, but failed to do so, and was therefore negligent.

> The defendants HMA and/or AHM, had a duty to comply with all applicable federal state or provincial regulations intended to ensure the purity and safety of its food product, including the requirements of the Canadian Food Inspection Agency guidelines/standards and/or the U.S. Food and Drug Administration guidelines/standards.

> The defendants HMA and/or AHM, failed to comply with the provisions of the health and safety acts and regulatory agency guidelines identified above and as a result was negligent per se in its sourcing, distribution and sale of food adulterated with Salmonella, a deadly pathogen.

> As a direct and proximate cause of the defendants, HMA's and/or AHM's negligence, as set forth above, the defendant, BEB, sustained injuries and damages in an amount to be determined at trial.

[39 at 18–19.]  Health Matters argues that "[a]s in the Seventh and Eighth cross-claims, the Ninth

cross-claim sets out no facts showing 'injuries and damages' suffered, or how they were proximately

caused by Health Matters' negligence."  [42-1 at 7.]  With respect to the claim for negligence *per se*,

> BEB's negligence per se cross-claim also fails to state a claim in similar fashion to its failure to plausibly allege contract cross-claims.  To invoke the negligence per se doctrine, a particular statute alleged to have been violated must be set out in detail.  *In re Sept. 11 Prop. Damage & Bus. Loss Litig.*, 468 F. Supp. 2d 508, 522 (S.D.N.Y. 2006), *aff'd sub nom. Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166 (2d Cir. 2013) (dismissing negligence per se claims where plaintiffs

offered only the conclusory allegation that a defendant failed to follow fire and safety codes). As with its failure to identify specifically breached contract terms, BEB has not identified any specific law establishing a standard of care that Health Matters violated, whether state, federal, or foreign, and the Ninth cross-claim thus fails to state a claim. *See id.*

Moreover, without having asserted a specific provision of law alleged to have been violated, it is also impossible to determine whether BEB is among the class of people the (unstated) law was intended to protect. *See Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 448 (W.D.N.Y. 2001); *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995) ("Only statutes designed to protect a definite class of persons from a particular hazard, which persons within the class are incapable of avoiding, can give rise to negligence per se for violation of the statute."). More likely, however, is that any laws Health Matters' alleged conduct breached were intended to protect consumers from health risks, rather than upstream providers of manufacturing services that only claim to have suffered economically from participation in a voluntary recall. *See* Cross Claims ¶¶ 99, 104.

[42-1 at 8–9.] Bio Essential responds as follows:

*Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 406 (S.D,N.Y. 2013), which lays out a prima facia case for negligence, as follows: "... a plaintiff must show (1) that the manufacturer owed plaintiff a duty to exercise reasonable care; (2) a breach of that duty by failure to use reasonable care so that a product is rendered defective, i.e, reasonably certain to be dangerous; (3) that the defect was the proximate cause of the plaintiff s injury; and (4) loss or damage." In the Ninth Cross-claim (Doc # 39, paragraphs 123 to 127), Bio Essential alleges that Health Matters owed a duty to Bio Essential to use reasonable care in the sale of its food products to ensure that the seeds did not become contaminated, specifically that they had a duty to comply with laws regarding food products for human consumption, that they breached that duty and that their failure to comply with the laws and regulations governing food caused the injuries and that Bio Essential was damaged. The damages were discussed hereinabove, but generally consist of business losses and litigation expenses incurred due to the recall by Health Matters and Navitas, LLC. Health Matters again cites the *Bocre v.* GMC case for the fact that there would be contractual remedies between the parties, however in this case the only contracts between the parties were for bailment and for the sale of goods. No contract containing any specific warranty disclaimer or contemplating damages from a recall or breach of the sales arrangement was contemplated by either party, and therefore any reliance upon such "contract claims" in the context of the negligence allegations herein is wholly misplaced. Moreover, "Under New Yorlc

law, 'violation of a State statute that imposes a specific duty constitutes negligence per se, or may even create absolute liability.'" *In re September 11 Prop. Damage & Bus. Loss Litig., Inc. v. Pont Auth.*, 468 F. Supp. 2d 508, 522, (S.D.N.Y. 2006). In particular, while no specific laws were referenced in the Cross-claim, reference to numerous laws and regulations were invoked by reference to U.S. F.D.A, guidelines and standards and the CFIA guidelines and standards. The specific laws or regulations violated are likely numerous and the negligence alleged in the claim is enough to give rise to liability on the part of Health Matters alone, without invoking specific statutory or regulatory provisions at this early stage in the litigation. The purpose of the pleading is to put the parties on notice of the claims against the party from which relief is being sought. Therefore, clearly the basis of a negligence claim has been plead [sic] and the incorporation of federal laws and guidelines by reference make this Ninth Cross-claim sufficiently plead [sic].

[69 at 14–16.]

"Negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract. The two claims may be submitted as alternatives to the jury, as a matter of both New York substantive law and federal procedural law. A negligence claim may be brought provided that the plaintiff alleges that a legal duty independent of the contract itself has been violated." *Dorking Genetics v. United States*, 76 F.3d 1261, 1269 (2d Cir. 1996) (internal quotation marks and citations omitted). "Under the rule of negligence *per se*, if (1) a statute is designed to protect a class of persons, (2) in which the plaintiff is included, (3) from the type of harm which in fact occurred as a result of its violation, the issues of the defendant's duty of care to the plaintiff and the defendant's breach of that duty are conclusively established upon proof that the statute was violated." *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 748 (S.D.N.Y. 2017) (internal quotation marks and citations omitted). Like the seventh cross-claim, the ninth cross-claim does not do enough to set forth a legal duty independent of any contractual relationship between Bio Essential and Health Matters. The ninth cross-claim also does not do

enough to set forth the elements necessary for a claim of negligence *per se*. Neither membership in a protected class nor any specific statute or regulation appears in the ninth cross-claim. *Cf. Bishop v. Best Buy, Co. Inc.*, No. 08 CIV. 8427 LBS, 2011 WL 4011449, at *9 (S.D.N.Y. Sept. 8, 2011) (dismissal of a claim that "fails to cite any statute imposing a specific duty to protect Plaintiff that Defendants breached"); *Anchundia v. Ne. Utilities Serv. Co.*, No. CV 07-4446 (AKT), 2010 WL 2400154, at *5 (E.D.N.Y. June 11, 2010) ("Where plaintiff fails to identify the statute upon which the claim is based, it is impossible to determine if the plaintiff was in a class sought to be protected by the statute or whether the injury suffered by the plaintiff was the type of injury the statute was designed to prevent. It is also impossible to assess whether the defendant breached a duty imposed by statute."). Nonetheless, as with the plaintiff in *Anchundia*, one opportunity to amend is appropriate under the circumstances. The Court thus recommends granting Health Matters's motion with respect to Bio Essential's ninth cross-claim, but without prejudice to amend.

> v. *Tenth and Eleventh Cross-Claims*

Health Matters seeks dismissal of Bio Essential's tenth and eleventh cross-claims, for unfair trade practices and fraud. The tenth cross-claim reads in its entirety as follows:

> Defendants, HMA and/or AHM, made certain false statements, and continues to disseminate and/or disseminated and/or fails to correct its false statements in trade journals, their promotional materials, and at trade shows among other methods citing Defendant BEB as the cause of the salmonella contamination of the chia seeds which are the subject of this action.

> That said false statements were placed in trade journals, their promotional materials, and at trade shows among other methods had not been proven to be true and are in fact patently false.

> That the trade journals and/or HMA and/or AHM's promotional materials had been distributed around the U.S., Canada and globally helped to spread false

27

claims and caused harm to Defendant BEB's reputation and business.

That said acts of spreading misinformation or false claims to consumers and others in the industry was part of a pattern directed by defendants, HMA and/or AHM attempting BEB attempting to shift the cause of the Recall and underlying facts and issues onto BEB, with the intention of discouraging others from purchasing products tolled by BEB or from sending seeds, grains and beans to BEB for tolling.

By reason of the foregoing, the Defendants, HMA and/or AHM, engaged in the intentional acts or practices which were materially false and deceptive.

In particular, trade journals, their promotional materials, and at trade shows among other methods were oriented to inform consumers and other businesses in the trade of organic foods, superfoods, and sprouted foods, in an effort to direct business to HMA and/or AHM and away from BEB.

That as a result of the deceptive and unfair trade practices of Defendants, HMA and/or AHM, defendant, BEB, sustained injuries and damages in an amount to be determined at trial.

[39 at 19–20.] The eleventh cross-claim reads in its entirety as follows:

Defendants, HMA and/or AHM, made certain false statements, and continues to disseminate and/or disseminated and/or fails to correct its false statements in trade journals, their promotional materials, and at trade shows among other methods citing Defendant BEB as the cause of the salmonella contamination of the chia seeds which are the subject of this action.

That said false statements were placed in trade journals, their promotional materials, and at trade shows among other methods had not been proven to be true and are in fact patently false.

That the trade journals and/or HMA and/or AHM's promotional materials had been distributed around the U.S., Canada and globally, helped to spread false claims and have caused harm to Defendant BEB's reputation and business.

That said acts of spreading misinformation or false claims to consumers and others in the industry was part of a pattern directed by defendants, HMA and/or AHM against BEB attempting to shift the cause of the Recall and underlying facts and issues onto BEB, with the intention of discouraging others from purchasing products tolled by BEB or from sending seeds, grains and beans to BEB for tolling.

By reason of the foregoing, the Defendants, HMA and/or AHM, engaged in the intentional acts or practices which were materially false, deceptive and fraudulent.

In particular, trade journals, their promotional materials, and at trade shows among other methods were oriented to inform consumers and other businesses in the trade of organic foods, superfoods, and sprouted foods, in an effort to direct business to HMA and/or AHM and away from BEB.

As a result of the deceptive, negligent and fraudulent acts of defendants, HMA and/or AHM, BEB has sustained injuries and damages in an amount to be determined at trial.

[39 at 21.] To the extent that both cross-claims mention the phrase "unfair trade practices,"

Health Matters has guessed that Bio Essential had certain statutes in mind and argues as follows:

BEB's "Unfair Trade Practices" cross-claims do not identify a specific statute, but rather appear to resemble a claim under Section 349 of New York's General Business Law, which protects consumers from deceptive acts and practices. There is no private right of action to enforce provisions of the Federal Trade Commission Act that prohibit unfair or deceptive acts or practices in commerce, 15 U.S.C. § 45(a). *Li Xi v. Apple Inc.*, 603 F. Supp. 2d 464, 470 (E.D.N.Y. 2009).

The elements of a § 349 claim are that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *City of N.Y. v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 455 (2d Cir. 2008). The deceptive acts must be harmful to the public at large, *Holmes Prot. of N.Y., Inc. v. Provident Loan Soc. of N.Y.*, 179 A.D.2d 400 (1st Dep't 1992), and oriented to consumers, not businesses. *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 475 (S.D.N.Y. 2014). While BEB mentions consumers, Health Matters' alleged conduct was clearly business oriented, not consumer oriented. BEB alleges Health Matters: (1) made these misrepresentations in trade journals, promotional materials, and at trade shows; (2) intended to "discourage others from purchasing products tolled by BEB or from sending seeds, grains and beans to BEB for tolling;" and (3) oriented its misrepresentations towards "consumers and other businesses in the trade of organic foods, superfoods, and sprouted foods." Cross-Claims ¶¶ 131–33. The allegations are of deception directed not at the public at large, *see Holmes Prot. of N.Y., Inc.*, 179 A.D.2d at 400, but at "the industry." *See* Cross-Claims ¶ 131. The only reasonable conclusion to be drawn from the cross-claims is that the only

"consumers" of BEB's products and services are businesses like Health Matters and Plaintiff, Navitas.

Further, the Tenth and Eleventh cross-claims do not allege deception of consumers in New York. GBL § 349(a) requires that the transaction in which the consumer is deceived must occur in New York; it is not enough that the defendant is a New York business or "hatched a scheme" in New York. *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 (2002). BEB's cross-claims make no showing [that] any deception actually took place, offering only the general allegation that Health Matters' trade journals and promotional materials were "distributed around the U.S., Canada and globally." Those assertions alone do not state a claim under GBL § 349. Since BEB has not alleged any consumer-oriented deception, or deception in New York, its cross-claims 1apparently under GBL § 349 cannot stand.

[42-1 at 9–10.] Health Matters argues the following in response to any suggestions of fraud:

Finally, BEB's Eleventh cross-claim purports to assert a fraud claim in addition to "unfair trade practices," but fails to plead fraud with any particularity as required by Rule 9(b). To plead fraud in compliance with Rule 9(b), a cross-claim must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Nowhere does BEB specify the fraudulent statements it contends Health Matters made, nor does it state when and where those statements were made beyond a minimal description of the types of forum where Health Matters offered general misrepresentations. Accordingly, the Eleventh cross-claim allegations fail to plead fraud with particularity, and must be dismissed under Rule 12(b)(6).

[42-1 at 10.] In response, Bio Essential more or less confirmed Health Matters's guesses about possible statutes in play. Bio Essential then proceeds to defend its allegations of unfair trade practices and fraud:

The unfair trade practice and fraud which Health Matters perpetrated consisted of the intentional dissemination of misrepresentations to the industry and to the public in general claiming that the recalls which Health Matters had to participate in were traced back to Bio Essential. This has little if any basis in fact as the Canadian Food Inspection Agency's testing, inspections and reports all indicate that there was no signs of contamination from Bio Essential's facility. (See

Affirmation of Gail Barker.)  This can only mean that either the contamination occurred before the seeds were delivered to Bio Essential and was carried through the processing of those lots of seeds which contained contaminated seeds and was not spread to any other lots or seeds processed by Bio Essential, or after the manufactured products left Bio Essential's facility.  None of that is contemplated in Health Matters' press releases (see Affirmation of Gail Barker, Exhibit G).  This information was disseminated specifically to shift blame from Health Matters for their negligent acts in sourcing lower quality seeds and possibly in the manner in which they stored and handled the seeds when they received them.  This dissemination of false information to shift the blame to others for their part in the contamination of their products caused harm to Bio Essential, but it also misleads consumers who purchase Health Matters products.  Those consumers have been lead into a false sense of security assuming that Health Matters has their interests at heart when it is clear that many consumers suffered as a result of Health Matter's [sic] loose and poor business practices aimed to test exactly how a drop [in] the quality of their raw materials might impact their bottom line.

Under NY General Business Law §349(h), the elements of a claim are (1) that the defendant's deceptive acts are directed at consumers, (2) that the acts are misleading in a material way, and (3) that the plaintiff has been injured as a result. *See City of N.Y. v. Smokes-Spirits.com, Inc.*, 541 F3d 425, 455 (2d Cir. 2008).  As described above, the acts were directed at consumers as they were issued wholly for the purpose of letting customers and consumers who purchase Health Matters products know that their products are safe and that they didn't do anything wrong, and that it was Bio Essential who was the source of the contamination.  This was communicated to industry publications and to the public at large.  As discussed above, the purpose of which was to inform the public that Health Matters was not at fault, so that they would continue to purchase the Health Matters products.  The result of these acts means little interruption in purchasing from consumers of Health Matters products and that trade customers of Bio Essential would be dissuaded from making purchases from Bio Essential because of the stigma placed upon it by Health Matters' president, Jerry Ziefinan in blaming Bio Essential for the contamination and recalls.  Health Matters, has practically come away from the recalls unscathed and has expanded its business in Europe and Asia since the recalls.  Moreover the misinformation supplied by Health Matters was spread from both their Ontario, Canada office and their Buffalo, New York office.  Health Matters sells its products all across New York State and all across the U.S., Canada and internationally under the brand name, "Organic Traditions" in grocery stores, health food stores and big box retailers like Walmart.  For Health Matters to argue that their actions in spreading false and misleading information had no harm to consumers in New York is to ignore how wide spread their distribution has become and to ignore the fact that the U.S. entity for Health Matters is located in Buffalo,

31

New York, which was why the action was filed in New York in the first place. Finally, the harm caused by Health Matters actions has been lost business opportunities and litigation expenses which are continuing to accrue both in this lawsuit and in the two Canadian lawsuits which are ongoing.

As to the Eleventh Cross-claim regarding fraud (Doc # 39), the allegations in the crossclaim are required to comply with Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9 requires that the claims must specify the statements that were fraudulent; identify the speaker, and where and when the statements were made and why they were fraudulent. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Particular to the claims, Bio Essential in paragraph 135 identifies who has disseminated the false information, namely Health Matters, and as has been described herein and in the Affirmation of Gail Barker, that those statements were made by Health Matters' President Jerry Ziefman. (Doc # 39, ¶ 135.) The content of the statements is described in paragraph 138, "attempting to shift the cause of the recall and underlying facts and issue onto BEB," in other words blaming Bio Essential for the contamination and recalls. These statements were publicly made and printed and were fraudulent as the Affirmation of Gail Barker points out because they are simply false, as there is no way that Bio Essential could have caused the contamination. (See Affidavit of Gail Barker.) The evidence from the tested samples and from the CFIA inspections and testing confirm that no contaminants were found at Bio Essential's facility. Moreover, the process and procedures in cleaning and sanitizing all equipment, materials, and the rooms in which the raw seeds are processed, eliminates the possibility of contamination at Bio Essential's facility. At this early stage of the litigation, Bio Essential does not have all of the specific statements made, but clearly the article attached as Exhibit G to the Affirmation of Gail Barker shows that Health Matters through its President was specifically blaming Bio Essential and defaming it without any evidence to support his claims that Bio Essential was at fault for the recalls.

[69 at 16–18.]

Bio Essential's allegations warrant a closer look at the purpose and operation of New York's General Business Law ("GBL") § 349. "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." GBL § 349(a). This principle operating subsection of the statute is very broad, and

individuals may enforce it through the private right of action at Section 349(h). The New York

Court of Appeals has elaborated on the type of conduct that the statute aims to prohibit:

> [A]s a threshold matter, plaintiffs claiming the benefit of section 349—whether individuals or entities such as the plaintiffs now before us—must charge conduct of the defendant that is consumer-oriented.
>
> Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior. The statute itself does not require recurring conduct. Moreover, the legislative history makes plain that this law was intended to "afford a practical means of halting consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds." Plaintiff, thus, need not show that the defendant committed the complained-of acts repeatedly—either to the same plaintiff or to other consumers—but instead must demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute.
>
> Proof that defendant's acts are directed to consumers, however, does not end the inquiry. A prima facie case requires as well a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof.

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y.

1995) (citations omitted). Implicit in *Oswego* and in the statute itself is the goal of leveling the

proverbial playing field that consumers and businesses use to transact. The typical consumer—and

the statute carries the connotation that "consumer" means an individual person—has neither the

time nor the means to investigate all internal information that businesses have about their

products and practices. Modern commerce would collapse if consumers could not trust

information in the marketplace as complete and accurate in all material respects. *See Watts v.

Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 2d 334, 346 (E.D.N.Y. 2008) ("Section 349 is meant to

empower consumers, especially the disadvantaged and to even the playing field of their disputes

with better funded and superiorly situated fraudulent businesses.") (internal quotation marks and

citations omitted); *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 102 (App. Div. 2012) ("The requirement that the consumer-oriented conduct be materially misleading limits the availability of section 349(a) to cases where the deception pertains to an issue that may bear on a consumer's decision to participate in a particular transaction. As such, the statute is limited in its application to those acts or practices which undermine a consumer's ability to evaluate his or her market options and to make a free and intelligent choice."). A representative but non-exhaustive list of activities that do or do not fall under GBL § 349 looks like this:

Activities which have been held violative of the statute include—

— the selling of street drug alternatives to circumvent drug laws, marketed as health products with "medical benefits" such as treating anxiety and depression.

— the solicitation of charitable funds, by a professional fundraiser with material asserting early detection, education, and research, where the organization was not directly involved in any education or research, and was so minimally involved in early detection efforts.

— fraudulent misrepresentations by a dentist to parents and custodians to induce consent for dental procedures, resulting in harm to subject children.

— small typeface and hidden location of fee disclosures in a credit card agreement, combined with high-pressure advertising.

— the failure to disclose that a seller was acting as a broker of a motor vehicle it sold, and failure to disclose that the seller was not the owner of the vehicle.

— a lender's direct mail solicitations, informing consumers that they had been preapproved for credit limit up to $1,000 or $2,500, where the offers did not state that most consumers did not receive even half of amount listed or reveal how likely consumer was to receive amounts above minimum.

— engaging in purposeful, deceptive monopolistic business practices, including entering into secret agreements with computer manufacturers and distributors to inhibit competition and technological development, and creating an applications barrier in software that, unbeknownst to consumers, rejected competitors' operating systems.

34

— a heating oil supplier's acts of signing customers to fixed price contracts and then charging higher prices.

— the imposition of quarterly charges on certain accounts by a bank, without notice or proper authorization.

— delivery of an automobile by an automobile dealer without notifying the purchaser that the automobile was subject to a recall notice prior to the sale and delivery.

On the other hand, the statute is not violated where—

— bank deposit tickets, indicated sufficient funds were available to cover particular debts, and holder received a brochure disclosing the bank's funds-availability policy, which advised customers of delays in availability of deposited funds and that withdrawals could not be made during the delay.

— the seller of a preowned vehicle under-reported a vehicle's purchase price.

— a law school published reports of statistics regarding postgraduate employment and salary data, since reasonable consumers seriously considering law schools are a sophisticated subset of education consumers capable of sifting through numerous sources of information and weighing alternatives before deciding which law school to attend, and the school disclosed that salary data was based on a relatively small percentage of responding students.

— a car rental company imposed additional charges for certain options, as well as an hourly late return charge, where such charges were fully disclosed prior to acceptance of the vehicle by the customer.

— a car rental company failed to inform its customers that they might, when renting a vehicle, already have insurance duplicative of collision damage waiver coverage, thus making unnecessary such coverage provided by the company, since the company could not be charged with knowledge superior to that of its customers regarding terms of their own contractual arrangements.

— a corporation's fully disclosed shipping and handling charges exceeded its actual costs.

21 N.Y. Jur. 2d *Consumer and Borrower Protection* § 8 (citations omitted). Three concepts can be inferred from the above list: 1) "consumers" again are generally understood to be individual

people; 2) businesses risk liability when they engage in deceptive acts about *their own* products or services and how they might be hiding information when pushing those products or services into the marketplace; and 3) the deceptive acts have to affect a potential consumer decision to acquire the products or services in question.

Understanding the principles from *Oswego* and the three concepts described above reveal how Bio Essential's tenth and eleventh cross-claims fall short of advancing a cognizable claim under GBL § 349. Under the most generous possible reading of the tenth and eleventh cross-claims, Bio Essential is accusing Health Matters of blaming it falsely for the salmonella outbreak. Health Matters is not being accused of lying about its own product at the time of sale, to induce Bio Essential to buy. The cross-claims do not clarify whether any alleged conduct by Health Matters occurred in New York. Bio Essential has not established that it qualifies as the type of consumer contemplated under GBL § 349. *See, e.g., Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004) ("The New York courts have also suggested that a consumer, for § 349 purposes, is one who purchases goods and services for personal, family or household use.") (internal quotation and editorial marks and citations omitted); *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999) ("Generally, claims under the statute are available to an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising.") (citation omitted). Finally, the entire allegation of unfair trade practice appears to fall within the context of a contractual relationship between Bio Essential and Health Matters. *See Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 65 (2d Cir. 2010) (conduct "unique to the parties" does not fall under GBL § 349).

36

Since the same purported conduct forms the basis of Bio Essential's fraud allegations, the fraud allegations do not fare any better. "To state a claim for fraudulent inducement under New York law, Plaintiffs must allege the following elements: (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 246 (S.D.N.Y. 2011) (internal quotation marks and citations omitted). "A practice may carry the capacity to mislead or deceive a reasonable person but not be fraudulent. That distinction separates plaintiffs' fraud claims from their section 349 claims. Fraud is wrongful enough to occupy a civil classification just short of criminal conduct. Over the years fraud has generally been defined by behavior involving intentional, false representations and other connotations of scienter such as willfulness, knowledge, design and bad faith." *Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 606 (N.Y. 1999) (citations omitted). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Here, to the extent that Bio Essential is suggesting fraudulent inducement, it has not pled that anyone actually was fraudulently induced to change course in business transactions. Bio Essential has not pled that it was defrauded or fraudulently induced in any way; the eleventh cross-claim reads as if other entities should be making the claim that they did or did not make business decisions based on Health Matters's alleged lies. The eleventh cross-claim also lacks details about where the fraud occurred, who was

involved, and what precise harm resulted beyond damage to reputation, which perhaps would fall under some other claim like libel or slander.

For the above reasons, the tenth and eleventh cross-claims do not set forth cognizable claims in their current form. Since, however, the Court is recommending an opportunity to amend other cross-claims, there is no harm in giving Bio Essential a chance to amend these to cross-claims as well. The Court thus recommends granting Health Matters's motion with respect to Bio Essential's tenth and eleventh cross-claims, but without prejudice to amend.

### C. Rowland Seeds Motion (Dkt. No. 49)

Third-party defendant Rowland Seeds Inc. had filed this motion seeking dismissal of the third-party complaint as against itself, for several reasons. The motion technically remains pending, but Rowland Seeds Inc. was released from this case by stipulation on January 18, 2018. [82.] The Court accordingly recommends denying this motion as moot.

### D. Avafina Motion (Dkt. No. 56)

As with the motion by Rowland Seeds Inc., third-party defendant Avafina Commodities Inc. had filed this motion seeking dismissal of the third-party complaint as against itself, for various reasons. The motion technically remains pending, but Avafina Commodities Inc. was released from this case by stipulation on January 18, 2018. [83.] The Court accordingly recommends denying this motion as moot.

### E. *EVI Motion (Dkt. No. 64)*

EVI has filed a motion that primarily[3] seeks dismissal of the third-party complaint under the abstention doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). The key fact supporting EVI's request is the existence of a Canadian case related to this one: *Advantage Health Matters Inc. and Health Matters America Inc. v. EVI International Group LLC et al.*, No. CV-16-553341 (Can. Ont. Sup. Ct. J.) (the "Canadian Case"). [50-3.] In the Canadian Case, filed on May 24, 2016, Health Matters is suing EVI International Group LLC, EVI Inc., Tradin Organics USA LLC, Rowland Seeds Inc., Avafina Commodities Inc., Bio Essential Botanicals, Inc., Live Better Brands LLC, and Everspring Farms. The factual allegations of the Canadian Case are summarized in these paragraphs from the complaint:

> Between May 30, 2014 and February 17, 2016, certain lots of branded products, including Organic Traditions Sprouted Chia Seed Powder, Organic Traditions Sprouted Chia and Flax Seed Powder, Organic Traditions Sprouted Flax Seed Powder, Organic Traditions Ultimate Superfood Trail Mix, and Organic Traditions Dark Chia Seeds (collectively, the "Products"), sold by the Plaintiffs to various wholesale and retail customers, were recalled by the Canadian Food Inspection Agency and the U.S. Food and Drug Administration for suspected Salmonella contamination (the "Salmonella Contamination"). The recalls have and will result in losses and damages being sustained by the Plaintiffs.
>
> The raw chia and raw flax seeds used in the Products (collectively, the "Seeds") were purchased by Advantage Health from EVI, Tradin, Rowland, Avafina, John Doe, and Jane Doe (collectively, the "Vendors"), pursuant to contracts of sale (the "Seed Contracts").

---

[3] EVI has asked for permission to incorporate by reference certain arguments that Rowland Seeds Inc. and Avafina Commodities Inc. had made against the third-party complaint, under Rule 12(b)(6), before they were stipulated out of the case. The Court will not permit the incorporation. The arguments by the now-dismissed defendants that EVI wants to incorporate were intertwined with factual circumstances and other arguments peculiar to those defendants. That said, Health Matters is on notice that a more definite statement under Rule 12(e), or some other amplification of its pleading, might be prudent as a way to avoid additional motion practice.

Advantage Health packaged some of the Seeds and sold them as Organic Traditions Ultimate Superfood Trail Mix and Organic Traditions Dark Chia Seeds to various wholesale and retail customers, including Health Matters. Health Matters resold the Organic Traditions Ultimate Superfood Trail Mix and Organic Traditions Dark Chia Seeds to other wholesale and retail customers.

Advantage Health sent some of the Seeds to BioEssential and Everspring (collectively, the "Processors") to be germinated and milled pursuant to processing contracts (the "Processing Contracts"). Advantage Health packaged some of the germinated and milled Seeds received from the Processors and sold them as Organic Traditions Sprouted Chia Seed Powder, Organic Traditions Sprouted Chia and Flax Seed Powder, and Organic Traditions Sprouted Flax Seed Powder to various wholesale and retail customers, including Health Matters. Health Matters resold the Organic Traditions Sprouted Chia Seed Powder, Organic Traditions Sprouted Chia and Flax Seed Powder, and Organic Traditions Sprouted Flax Seed Powder that it purchased from Advantage Health to other wholesale and retail customers.

The Defendants knew and were aware that the Seeds were to be repackaged, processed, distributed, and sold as health food products for human consumption.

[50-3 at 6–7.]

EVI reads the factual allegations from the Canadian Case to be identical to the allegations from Health Matters's third-party complaint here. On that basis, EVI considers the Canadian Case to be a parallel proceeding and believes that the factors outlined in *Colorado River* warrant abstention:

The Third-Party Complaint is completely duplicative of the Canadian equivalent of the complaint in the Ontario Action. *Compare* Wilson Ex. A *to* Wilson Ex. C. The plaintiffs in the Ontario Action are the same as the Third-Party Plaintiffs in the instant action. All five of the Third-Party Defendants in this action are also parties defendant in the Ontario Action. The sole factual issue, namely, whether the Third-Party Defendants sold contaminated chia seeds to the Third-Party Plaintiffs in Canada, is identical in both actions. Even the *legal theories* in each case are nearly identical, despite the fact that the cases are pending in different countries: In both cases, HMA and AHM allege that the defendants were negligent, breached implied and express warranties, and are subject to strict liability.

[64-1 at 3.]

Health Matters opposes abstention and addresses each of the *Colorado River* factors. Health

Matters's arguments include the following:

> Similarity of the parties. There is a very important difference in the parties in that Navitas is the Plaintiff in this action but is not involved in the Ontario action. The similarity of parties will be further diminished following this motion sequence, as Avafina and Rowland will no longer be parties in the this action, but will remain defendants in the Ontario action.

> Similarity of the issues. While many issues are admittedly similar between the two actions, the key difference here is that this action involves (and is limited to) damages allegedly suffered by Navitas in recalls of its products, and the Third-Party Complaint is limited to contribution and indemnification for any expenses awarded for those claims; the Ontario Action on the other hand relates to HMA and AHM's [Health Matters's] recalls and is specific to damages directly suffered by HMA or AHM. When issues in concurrent actions overlap, it can be sufficient to trigger Colorado River analysis, but if they contain additional and different issues, it is unlikely sufficient "to justify a surrender of a federal court's virtually unflagging obligation to exercise jurisdiction." *Carter v. 36 Hudson Assocs, LLC*, No. 09 CIV.4328DLC, 2010 WL 2473834, at *4 (S.D.N.Y. June 17, 2010).

> Order in which the actions were filed. The Third-Party Complaint in this action was necessarily filed after the Ontario Action, as HMA and AHM had no expectation that—or control over when—Navitas would sue them; thus their claims for contribution and indemnification against EVI technically do not ripen until Navitas has obtained a judgment against HMA and AHM, and that judgment has been satisfied. Moreover, little progress has been made in the Ontario Action, which is still in the initial stages, *see* Brock Decl. ¶ 5, even if EVI's Memorandum of Law asserts the Ontario Action is "well into discovery" (Dkt. 64-1 at 7). In *Carter*, where discovery was far from complete in parallel state and federal actions, the Southern District of New York held that this factor weighed against abstention as the actions were equally far from resolution. *Carter*, 2010 WL 2473834, at *5. As discovery is incomplete and not progressing in the Ontario Action, these matters are equally far from resolution.

[72 at 10–11.]

The Court begins with a review of the principles governing abstention for reasons related

to parallel proceedings. "Abstention from the exercise of federal jurisdiction is the exception, not

the rule. The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Colorado River*, 424 U.S. at 813 (internal quotation marks and citation omitted). "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983), *superseded in part on other grounds as stated in, e.g., Finnie v. H & R Block Fin. Advisors, Inc.*, 307 F. App'x 19, 21 (8th Cir. 2009) (unpublished decision). Though no mechanical checklist applies, courts contemplating abstention under *Colorado River* should consider, among other factors, "(1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights." *Woodford v. Cmty. Action Agency of Greene Cty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001) (citations omitted).

The above factors evolved in the context of domestic litigation, when the potential parallel proceedings came from federal and state court. When the proceeding that is potentially parallel to federal litigation comes from an international tribunal, the emphasis changes a little. "[T]he starting point for the inquiry remains unchanged: a district court's virtually unflagging obligation to exercise its jurisdiction. In weighing the considerations for and against abstention, a court's heavy obligation to exercise jurisdiction exists regardless of what factors are present on the other side of the balance." *Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 93 (2d Cir. 2006) (internal quotation marks and citations omitted). That said, "[i]n the context of parallel proceedings in a foreign court, a district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency. Proper consideration of these principles will no doubt require an evaluation of various factors, such as the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction. This list is not exhaustive, and a district court should examine the totality of the circumstances to determine whether the specific facts before it are sufficiently exceptional to justify abstention." *Id.* at 94 (internal quotation marks and citations omitted); *see also AAR Int'l, Inc. v. Nimelias Enterprises S.A.*, 250 F.3d 510, 518 (7th Cir. 2001) ("[W]e apply the same general principles with respect to parallel proceedings in a foreign court in the interests of international comity.") (citations omitted).

Here, the totality of the circumstances weighs against abstention. The one issue that draws the Court's attention the most, and that has received the most consideration from the Court, is an issue that stretches across most if not all of the *Colorado River* factors: the absence of Navitas from the Canadian Case. In the Canadian Case, Health Matters is suing a number of other companies—including companies no longer present in this case—for contractual and other damages that it allegedly suffered when it bought contaminated seeds. As the plaintiff in the Canadian Case, Health Matters seeks full recovery of its claimed damages regardless of what happens with indemnity or contribution among the defendants that it named. In contrast, Health Matters filed the third-party complaint here not to seek any recovery for itself, but rather to soften any blow, through contribution, that a jury might deliver should Navitas ultimately win at trial. (*See* [35 at 6] "If Plaintiff Navitas sustained damages as alleged in the Complaint through any culpable conduct other than its own, said damages were proximately and substantially caused by each of the Third-Party Defendant Seed Vendor's breach of its implied warranty of merchantability, without any culpable conduct on the part of Defendants/Third-Party Plaintiffs contributing thereto.").[4] Navitas is not a party at all in the Canadian Case, but it is the only plaintiff here; its presence here adds a layer of events and a layer of complexity that will never be litigated in the Canadian Case.[5] *Cf. Lexington Ins. Co. v. Integrity Land Title Co.*, 721 F.3d 958, 970 (8th Cir. 2013) (affirming a finding of no parallel proceedings; "Resolution of Fidelity's tort and contract claims against

---

[4] Incidentally, the difference in the relief that Health Matters seeks here and in the Canadian Case is why the Court also recommends rejection of EVI's argument about election of remedies.

[5] Navitas's presence also distinguishes one of the cases that EVI has cited; there can be no "same core allegations" in the Canadian Case and this case unless Navitas is ignored completely. *See Ferolito v. Menashi*, 918 F. Supp. 2d 136, 142 (E.D.N.Y. 2013).

Integrity would demand no interpretation of the E & O policy nor clarify for Lexington whether it owed a defense to Integrity in Fidelity's two lawsuits (or if it owed Integrity reimbursement of any defense costs associated with the other state-court actions)."); *Kirby McInerney LLP v. Lee Med., Inc.*, No. 17-CV-4760 (KBF), 2017 WL 4685101, at *3 (S.D.N.Y. Oct. 16, 2017) (finding no parallel proceedings where certain substantive issues appeared as principal claims in one smaller case and cross-claims in a larger case with a different plaintiff). In a sense, then, the Canadian Case could be viewed as a subset of this case: An ultimate resolution of all issues in this case could have a *res judicata* effect on the entire Canadian Case, while an ultimate resolution of the entire Canadian Case could be limited to a collateral estoppel effect on contribution without affecting Navitas at all. *Compare Coakley Landfill Grp. v. IT Corp.*, 116 F. Supp. 2d 244, 246 (D.N.H. 2000) ("Jurisdiction in this suit is based upon diversity of citizenship and none of the claims involve federal law. However, this is the only forum with jurisdiction over all of the parties and, although the state forum may adequately protect the interests of the parties, the state has already stayed its proceedings to avoid piecemeal litigation and in the recognition that the federal forum is more convenient.") *with Commercial Cas. Ins. Co. v. Swarts, Manning & Assocs., Inc.*, 616 F. Supp. 2d 1027, 1033–34 (D. Nev. 2007) (finding parallel proceedings where the combination of claims, cross-claims, and counterclaims created the same claims against the same parties in state and federal court); *see also Carter v. 36 Hudson Assocs., LLC*, No. 09 CIV.4328DLC, 2010 WL 2473834, at *4 (S.D.N.Y. June 17, 2010) (denying abstention "since the disputes in the two lawsuits are sufficiently distinct"). The court in the Canadian Case appears to have recognized that the Canadian Case would be the smaller circle within the larger circle here, if the two cases were

represented in a Venn diagram. At oral argument, the parties represented to the Court that the court in the Canadian Case has either formally or informally stayed proceedings, waiting to see what happens here. That delay offsets the technical fact that the Canadian Case was filed first.

A lesser factor that the Court has considered is the possibility of a peripheral federal question entering the case. As explained above, the Court is recommending dismissal of some of Bio Essential's cross-claims but without prejudice to amend. One of the cross-claims subject to amendment concerns negligence *per se*. Upon amendment, if Bio Essential identifies specific federal statutes or regulations whose violation could be addressed only here then litigating a potential federal violation in federal court would add some weight to the argument against abstention. *Cf. Andrea Theatres, Inc. v. Theatre Confections, Inc.*, 787 F.2d 59, 63 (2d Cir. 1986) ("Although state courts may properly consider federal claims raised as defenses in a state court action, including claims over which federal courts have exclusive jurisdiction, they may not grant affirmative relief based on claims for which federal jurisdiction is exclusive.").

Under these circumstances, the Court does not consider this case and the Canadian Case to be parallel proceedings. Even if the two cases were parallel, abstention would lead only to scenarios that prejudiced Navitas for no good reason. If the Court abstained from addressing the third-party complaint only then piecemeal litigation would result. Navitas would be prevented here from receiving a full and proper apportionment of any damages that it suffered; at the same time, Navitas would be left looking on helplessly as part of that full and proper apportionment ran its course in a foreign country without its involvement at all. Though in a different procedural posture, an analogous logic appeared in *Glenclova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292,

46

313 (S.D.N.Y. 2012); the court there stayed a federal case that was missing certain parties, while those missing parties litigated an important issue in state court. The analogy to this case comes through the principle that courts, when possible, should avoid imposing outcomes on parties who are not even present to challenge those outcomes. Alternatively, the only way in which the Court could grant abstention while avoiding piecemeal litigation would be to stay the entirety of this case, which would leave Navitas waiting months or years to pursue its own relief for reasons completely out of its control. Given again that the court in the Canadian Case already has decided to wait and to see what happens here, letting this case move forward in full and in the ordinary course is the better approach. The Court thus recommends denying EVI's motion.

### F. Bio Essential Motion to Amend [68]

As an alternative to denial of Health Matters's motion to dismiss its cross-claims, Bio Essential cross-moved under Rule 15(a)(2) for leave to amend its own cross-claims. Rather than address the motion to amend separately, the Court chose to address the propriety of amending the cross-claims as it reviewed each part of Health Matters's motion. In short, the Court believes that allowing Bio Essential one opportunity to amend its cross-claims will cause no prejudice this early in the case and will satisfy the mandate that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court thus recommends granting Bio Essential's motion; the Court suggests that any amended cross-claims be filed within 20 days of the adoption of this Report and Recommendation by Judge Vilardo.

### G. *Advantage Health Matters and Health Matters Motion [71]*

Health Matters had filed a motion for an order "(1) denying Third-Party Defendants EVI Inc. and EVI International Group's motion to dismiss; (2) in the alternative, granting Defendants/Third-Party Plaintiffs' motion to amend the Third-Party Complaint." [71 at 2.] Since the Court is recommending denial of EVI's motion to dismiss on its own substance, a separate order to Health Matters to the same effect would be redundant. With denial, amendment would not be necessary. The Court thus recommends denying this motion as moot.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends adjudicating the motions currently pending as follows:

1)    Granting Health Matters's motion [42] to dismiss certain cross-claims in its entirety, but without prejudice to allowing Bio Essential one opportunity to file amended cross-claims;

2)    Denying the motion to dismiss by Rowland Seeds Inc. [49] as moot;

3)    Denying the motion to dismiss by Avafina Commodities Inc. [56] as moot;

4)    Denying the motion to dismiss by EVI Inc. and EVI International Group, LLC [64];

5)    Granting the motion by Bio Essential to amend its cross-claims [68] and directing Bio Essential to do so within 20 days of adoption of this Report and Recommendation; and

6)    Denying the motion to amend by Health Matters [71] as moot.

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted).  "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object.  The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice."  *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record.  Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review.  Such objections would

49

reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

_\_\_/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: March 14, 2018